**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**RYAN, LLC,**

        **Plaintiff,**

**v.**                                    **Case No. 8:12-cv-289-T-30TBM**

**CHARLES J. EVANS, JR., et al.,**

        **Defendants.**
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on Plaintiff's **Emergency Motion for Temporary Restraining Order** (Doc. 2).[1]  Although Plaintiff sought *ex parte* consideration of the motion, the motion indicated that Defendants were served with the motion and the court declined to consider the matter absent the participation of Defendants.  Expedited discovery was permitted.  On notice to the parties (Doc. 8) and in the given circumstances, I have construed the motion as one seeking a preliminary injunction.  Defendants have filed responses in opposition (Docs. 23, 31).  Additionally, the parties have filed affidavits, depositions, and other documentary evidence in support of their respective positions.[2]  *See id.*;  exhibits to hearing.  Oral arguments on the motion were conducted on February 24, 2012.  For

_____

[1]Plaintiff also filed a Notice of Filing Substitute Exhibits A and B to Plaintiff's Emergency Motion for Temporary Restraining Order.  (Doc. 14).

[2]Depositions and other documentary evidence were submitted at the hearing.  At present, a portion of those shall remain under seal.

the reasons that follow, it is recommended that Plaintiff's request for injunctive relief be granted in part.

## I.

## A.

Plaintiff, Ryan, LLC ("Ryan") initiated this action against Defendants, Charles J. Evans, Jr.; Allen Espinosa; Merit Appraisal & Tax Consulting GP, LLC ("Merit GP"); and Merit Appraisal & Tax Consulting, LP ("Merit LP")[3] on February 9, 2012, by the filing of a ten-count Complaint seeking damages and injunctive relief (Doc. 1). An eleven-count Amended Complaint seeking the same relief was filed on February 21, 2012 (Doc. 28). By its Amended Complaint, Ryan alleges claims for: violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq., as against all Defendants (Count I); tortious interference with business relationships as against all Defendants (Count II); breach of employee duty of loyalty against Evans and Espinosa (Count III); conversion as against all Defendants (Count IV); violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") as against all Defendants (Count V); conspiracy as against all Defendants (Count VI); breach of contract – non-solicitation of employees as against Evans (Count VII); breach of contract – failure to return Ryan property as against Evans and Espinosa (Count VIII); breach of contract – disclosure of confidential information as against Evans and Espinosa (Count IX); tortious interference with contractual relationships as against the Merit

---

[3]Defendants note that Merit LP's correct entity name is Merit Advisors, LP, and Merit GP's correct entity name is Merit Advisors GP, LLC. (Doc. 23, n.1).

Defendants (Count X); and violation of Florida's Uniform Trade Secrets Act as against all Defendants (Count XI). (Doc. 28).

B.

Many of the facts are undisputed. Such facts establish that Plaintiff Ryan is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas. Ryan offers a comprehensive range of tax advisory and consulting services. Pertinent to this suit, its Credits & Incentives Practice Group provides economic development and tax consulting services to businesses seeking to expand their operations. These services include acting as a liaison between the client and state or local economic development units in negotiating financial incentive packages for the client. Defendant Evans is a Florida resident and a former Director in the Credits & Incentives Practice Group of Ryan, based out of Ryan's office in Tampa, Florida. Evans was employed by Ryan from January 2005 to on or about January 3, 2012. Defendant Espinosa is a Florida resident and a former Senior Consultant in the Credits & Incentives Practice Group of Ryan, based out of Ryan's office in Tampa, Florida. He was employed by Ryan from August 2008 to on or about January 3, 2012. Espinosa worked with and reported to Evans. Evans and Espinosa both have law degrees. It appears that Evans has many years' experience in the credits and incentives area. At the outset of their employment with Ryan, Evans and Espinosa each signed an Employee Agreement. (Doc. 14). Merit LP is a limited partnership with its principal place of business in Tampa, Florida. Merit GP is a Texas limited liability company with its principal place of business in Gainesville, Texas, (Merit LP and Merit GP are referred to collectively as "Merit"). Merit also touts itself as a tax consulting firm. Prior to hiring Evans and Espinosa,

3

Merit did not offer credits and incentives services. Merit is part of a family of companies under B-29 Investments, LP ("B-29"). The principals of B-29 are John and Steve Schmitz. While with Ryan, Evans and Espinosa serviced some of the B-29 companies, including Merit. Ryan and Merit also share some mutual clients with whom Merit provides tax services and Ryan provides credits and incentives work.

In short, the instant skirmish here centers on Ryan's allegations, on information and belief, that Evans, Espinosa, and Merit conspired with each other to develop a credits and incentives business competitive with Ryan and to use Ryan's confidential and proprietary information to accomplish the plan and to steal Ryan's clients, employees, and know-how. Suffice it to say, not all the facts proffered in support of or against this claim are undisputed.

It is undisputed that on or about November 22, 2011, Evans and Espinosa, on behalf of Ryan, traveled to Houston, Texas for client status update meetings.[4] After those meetings, Evans and Espinosa met B-29 principals, John Schmitz and Steve Schmitz, along with Will Presson, for discussions about their potential employment with Merit and the expansion of Merit's operations to include credits and incentives work in Tampa. By Evans' account, he had a prior conversation with Presson in October about coming to work with Merit. Evans and Espinosa also claim that representatives at Ryan were aware they were unsatisfied and looking for new work opportunities. Evans wanted Espinosa to join him, and prior to the November meeting, he told Espinosa of the opportunity.

---

[4]It also appears undisputed that this portion of the meeting concerned status updates on Select Energy Services, LP ("Select Energy") and Bell Supply Company, LLC ("Bell"), two B-29 companies that Ryan and Merit both serviced at the time.

During that meeting, Evans and Espinosa discussed their work for Ryan and included information pertaining to Ryan's customers and revenues in the discussions.[5]  This was without the permission of Ryan or any of its clients.  As Merit presents this, Evans and Espinosa were familiar to them through their work at Ryan on behalf of various B-29 companies.  Merit was looking to go "in-house" with the credits and incentives work and, thus, had the discussions with Evans and Espinosa.  The participants were advised that neither Evans nor Espinosa was subject to a covenant not to compete under their Employee Agreements with Ryan.  The discussions led to an agreement in principle for Evans and Espinosa to join Merit at significant increases in pay.  Evans and Espinosa began working for Merit on January 3, 2011.

Evans and Espinosa concede that prior to leaving Ryan, they deleted documents from Ryan's computers and copied other documents from the same and transferred them to Merit computers.  Emails were also transferred over.  Ryan contends that recovery efforts have revealed that tens of thousands of documents including active business-related documents were *deleted*.  Espinosa maintains that he deleted only personal information and non-client related documents.  If any client information was deleted, he maintains it was not intentional.  Evans also deleted personal information.  Additionally, he admits that some Ryan

---

[5]According to Evans, he put together a binder of information showing, among other things, his sales and revenue production at Ryan.  Each participant in the meeting was given a binder.  By his account, he sought to demonstrate the profitability of the work he could bring to Merit.  The information came from Ryan's records as well as Evans' own knowledge and included a list of all of his projects and a list of contacts which he believed could possibly become Merit clients in the future.  Some of these potential clients had engagements with Ryan at that time.

5

documents and information on the G-drive and T-drive were deleted, although he insists that no client active or client inactive files (with the exception of Element Power documents discussed below) were deleted. According to declarations of Daniel Clark, Ryan's System Administrator, and Helen Lemmon, a Ryan manager, much of what was deleted, but not all, has now been restored. This is countered by the affidavit of Robert Curls, whose review of Clark's declaration indicates that nothing should have been permanently deleted.

Evans and Espinosa also admit that they *downloaded* certain Ryan files and documents including client files, client lists, and prospects lists, which they took with them to Merit.[6] The documents were uploaded onto their computers at Merit and/or onto Merit's server where they remain. It appears that IT personnel with Merit assisted in uploading this information. This was also done without Ryan's consent or permission. Their purpose in doing this is disputed. Ryan maintains that these files were taken so that they could be used in soliciting clients away from Ryan. Evans and Espinosa claim they took these materials so that they could assist Ryan and ensure Ryan stayed in compliance and met upcoming deadlines under its current engagements. In any event, with the one exception discussed below, Defendants assert that apart from the Ryan engagement letter which Evans used as a template for drafting his engagement letter with Merit, no Ryan data or information has been used since they joined Merit.

---

[6]At deposition, Evans acknowledged also taking an engagement letter template, an invoice template, file structure templates and filing systems, resumes and performance reviews of Ryan employees and prospective hires, work templates and standard project work plans, research files by state, status update reports, and revenue records.

Evans and Espinosa acknowledge one other impropriety while they were at Ryan. After agreeing to work with Merit but before they actually left Ryan, they initiated a new engagement with a company called Element Power. This business appears to have come to them on a referral from Merit. While Evans and Espinosa performed services for Element Power while still at Ryan, they did not book the engagement on Ryan's system and the services were not billed on Ryan's behalf. Evans attempted to cover this up by deleting Element Power's documents from Ryan's computer prior to their leaving. It also appears that Evans employed an electronic signature of his supervisor at Ryan without permission to "execute" this engagement letter.

After joining Merit, in addition to the work done on Element Power, Evans did work for Ryan client ICS, helping them with the December and January status reports.[7] However, he claims that he never billed for the work and told ICS that billings had to be paid to Ryan under their engagement letter. Proffered exhibits suggest that ICS wished to have Evans continue to do its work after he left Ryan and Evans admits that, while he did not try to get ICS to break the Ryan engagement letter, he discussed that with them. Evans also spoke with a representative of another Ryan client, Raymond James, after leaving Ryan and suggested that Ryan no longer had anyone with contacts with the economic development people

---

[7]Evans also testified to doing work for Select Energy, a B-29 company for which Ryan was performing work as well. From the Defendants' proffer, Merit hired Evans and Espinosa to look after the interests of Select Energy and Bell, both B-29 entities, and to help develop a new credits and incentives practice in Tampa. Evans urges that what work he has done for Select Energy since joining Merit did not interfere with Ryan's engagement, which Merit intends to honor. Further, in the absence of a non-compete covenant in Evans' and Espinosa's Employment Agreements, Defendants urge that they may seek to compete against Ryan in any *new* opportunities for such credits and incentives work.

involved on the client's project. Later, he emailed this same client to see if there was any credits and incentives work in connection with Raymond James' merger with Morgan Keegan.

As discussed below, Evans' and Espinosa's Employee Agreements (Doc. 14) contained provisions intended to ensure the confidentiality of Ryan's confidential and proprietary business information. While the Employee Agreements contained an anti-solicitation provision related to its employees, neither agreement contained a non-compete provision.

As for the Merit Defendants, they acknowledge that their intention to develop a credits and incentives practice was behind their decision to hire Evans and Espinosa but they urge that such did not violate any non-compete agreement with Ryan. They further deny that Evans and Espinosa undertook any of their purportedly inappropriate actions at their request or direction and they deny they have used any information brought to them by Evans and Espinosa. Although presently frozen by order of the court, they agree to return Ryan's information on their computers to Ryan. Further, they deny that they seek to solicit credits and incentives work from any presently engaged clients of Ryan with which Merit has had no prior relationship.

## C.

By its motion for injunctive relief and as argued at the hearing, Ryan urges the court to grant injunctive relief to preclude Defendants from: (1) destroying, altering and deleting any electronic evidence; (2) using or divulging any Ryan confidential information; (3) soliciting or providing services to any Ryan client that Evans and Espinosa solicited on behalf of Merit

while still employed with Ryan; (4) soliciting or providing services to any Ryan client for which any Defendant misappropriated, destroyed, altered or otherwise impaired its confidential or other business information; and (5) soliciting or providing services to any Ryan client in connection with which any Defendants have already committed one or more of the alleged violations.[8]  Additionally, it seeks authority to forensically examine any device containing Ryan documents or information, and the return to Ryan of any and all documents which were taken, removed, or copied and which are in the possession of any of the Defendants, including copies thereof.

In response, Evans and Espinosa initially contend that the court lacks subject matter jurisdiction over Ryan's claims.[9]  In short, they argue that their individual conduct cannot be brought within the purview of any provision of the CFAA, 18 U.S.C. § 1030, and the count should be dismissed.  As all the remaining counts assert state law claims, they urge that the court is without jurisdiction and the Amended Complaint should be dismissed.  Although asserting this jurisdictional issue and denying Ryan's entitlement to a preliminary injunction, the Merit Defendants do not object, in principle, to the entry of a preliminary injunction to allow for the return of Ryan property and to maintain the status quo.  However, they urge that the injunction proposed by Ryan goes too far and in effect grants Ryan non-compete

---

[8]These requests are contained in a proposed order that Plaintiff submitted at the close of the hearing.

[9]Evans and Espinosa filed a motion to dismiss raising this jurisdictional issue.  (Doc. 12).  The motion was denied as moot, apparently in light of the Amended Complaint (Doc. 28).  *See* (Doc. 52).  Defendants filed Answers and Affirmative Defenses again raising the jurisdictional claims.  (Docs. 49-51).

protection that it cannot rightly claim under the Employee Agreements of Evans and Espinosa since neither had a non-compete clause. Thus, the Merit Defendants are amenable to the entry of a preliminary injunction which enjoins them: (1) from using any information or data in any Ryan document, file or folder; (2) requiring the return of any Ryan document, file and folder transmitted in any manner to the Merit Defendants; (3) allowing for the inspection and imaging of the individual Defendants' computers; (4) restraining them from soliciting any current Ryan employee for employment; and (5) from soliciting credits and incentives work from any exclusive Ryan client.[10] *See* (Docs. 11, 23, 45). As indicated at the hearing, Evans and Espinosa evidence no objection to such procedure assuming they are not barred from competing for new business from existing clients of Merit and otherwise.

## II.

### A.

The question of subject matter jurisdiction must be addressed first. *See Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Ryan alleges the court's jurisdiction under 28 U.S.C. § 1331 on the basis of the CFAA claim at Count I. On that claim, Ryan argues that the Defendants violated the provisions of the CFAA in three ways: (1) by intentionally accessing Ryan's computers in a manner exceeding authorized access and

---

[10]The primary differences between the proposed injunctions relate to the search of the Merit Defendants' computers and the language set forth in Ryan's proposed injunction which would, in effect, bar Defendants from doing ongoing or new business with clients it did business with even before hiring Evans and Espinosa, including companies within the B-29 family of companies. There is no dispute about the return of the Ryan documents and parties have agreed to confer on an agreed protocol for the inspection of the Merit Defendants' computer by an independent forensic examiner.

thereby obtaining information from a protected computer in violation of 18 U.S.C.

§ 1030(a)(2)(C); (2) by knowingly and with intent to defraud accessed a protected computer in

a manner exceeding authorized access and by means of such conduct furthering the fraud or

obtaining a thing of value in violation of § 1030(a)(4); and (3) by knowingly causing the

transmission of a program, information, code, or command and as a result causing damage

without authorization to a protected computer in violation of § 1030(a)(5)(a).  Ryan contends

that Evans and Espinosa had no authority to access its computers to steal information and in

any event, exceeded their authorized access.  Evans and Espinosa counter that they had

authority to access Ryan's computers in the manner alleged and that Ryan takes too broad a

reading on this statute insofar as it claims that Evans and Espinosa exceeded their authorized

access to Ryan's computers by deleting or copying its data and information.  They urge that

since Ryan cannot bring this conduct within the purview of the CFAA, the court is without

jurisdiction over this suit.

Defendants' argument relies chiefly on two decisions from this court, *Clarity

Services, Inc. v. Barney*, 698 F. Supp. 2d 1309 (M.D. Fla. 2010) (Merryday, J.), and *Lee v.

PMSI, Inc*., No. 8:10-cv-2904-T-23TBM, 2011 WL 1742028 (M.D. Fla. May 6, 2011)

(Merryday, J.).  In short, they urge that under these cases, Evan's and Espinosa's deletion of

some records and copying of other records during their employ with Ryan did not violate the

CFAA as they were authorized to access the matters they deleted or otherwise copied and,

regardless of how the information was used, their conduct did not violate the CFAA.  To the

contrary, Ryan submits as an exhibit the declaration of Helen Lemmon, managing principal for

Ryan's Credits and Incentives Practice, who states that Ryan's IT policies generally prohibit

access to and use of Ryan computers except in furtherance of Ryan's business and that the activities of Evans and Espinosa were not in furtherance of Ryan's interest.[11]  In response, Defendants cite to *Lee* and urge that even if this conduct violated company policy as claimed, that fact standing alone does not reveal a violation of the CFAA.[12]  As for the claim that Evans and Espinosa exceeded their authority to access Ryan's computers, they urge that such is not the case under Judge Merryday's reading of this language in *Clarity*.  By Judge Merryday's construction, the CFAA, being a criminal statute, must be read narrowly.  Under a narrow reading of the provisions of § 1030, "a violation for 'exceeding authorized access' occurs where initial access is permitted but the access of certain information is not permitted."  *See Clarity,* 698 F. Supp. 2d at 1314 (citing *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343 (N.D. Ga. 2007).  Under this reading, "a violation does not depend upon the defendant's unauthorized use of *information,* but rather upon the defendant's unauthorized use of *access." Diamond Power Int'l, Inc.*, 540 F. Supp. 2d at 1343.[13]

By my consideration, on the showing made to date Defendants have the better argument, at least insofar as Ryan alleges violations of § 1030(a)(2)(C) and § 1030(a)(4).

---

[11]Although referenced by the declaration, a copy of the policy is not before the court.

[12]In *Lee*, Judge Merryday rejected the contention that an employee's personal use of a company computer in violation of company policy constituted a violation under the CFAA. *See Lee*, 2011 WL 1742028, at *2 (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir.2009) ("for purposes of the CFAA, when an employer authorizes an employee to use a company computer subject to certain limitations, the employee remains authorized to use the computer even if the employee violates those limitations. . . .").

[13]The CFAA defines "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter." 18 U.S.C. § 1030(e)(6).

Given that Evans and Espinosa appear to have had unfettered access to the Ryan computers, data, information, and emails actually accessed, with the right to add to, delete from, and upload and download matters therefrom, it is doubtful that their conduct can be brought within the purview of either § 1030(a)(2)(C) or § 1030(a)(4) under the narrow reading of those sections. However, it appears appropriate to conclude that the misconduct here falls within the purview of § 1030(a)(5), which appears directed at the unauthorized transmission of a command which damages the computer and causes a loss.

Section 1030(a)(5)(A) proscribes the knowing "transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." In this context, the CFAA defines "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Here, both Evans and Espinosa admit that they caused to be deleted data, information, and emails from Ryan's computers before leaving its employ. And, they admit that such was undertaken without the knowledge or permission of Ryan. While the deletions of personal emails or personal information appears authorized or permitted, other deletions intended to cover up certain of their activities after agreeing to work with Merit appear unauthorized and the transmission of the commands to accomplish this appear within the purview of this section of the CFAA.

Section 1030(g) provides that a civil action may be brought by a person who suffers damage or loss by reason of violation of this section only if conduct involves one of the factors set forth in subclauses (I)-(V) of subsection (c)(4)(A)(I). Here, Ryan relies on (c)(4)(A)(i)(1), which proscribes conduct which has caused loss to one or more persons during any one-year

period aggregating at least $5,000 in value. "Loss" is defined to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, . . . or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). On the declarations of Daniel Clark and Helen Lemmon, the activities of Evans and Espinosa arguably impaired the integrity or availability of Ryan's data or information. Even though much of the deleted data and information has been recovered, it appears that not all such deleted matters were recovered. While disputed, such permanent loss of data reveals the necessary damage required by this section.[14] *See Cheney v. IPD Analytics, LLC,* No. 08-23188-CIV, 2009 WL 1298405, at * 6 (S. D. Fla. Apr. 16, 2009). And, the (c)(4)(A)(i) loss requirements appear to be satisfied given the disruption and that recovery was achieved only after significant and costly efforts. In short, at least to this extent on the evidence presented thus far, I conclude that the court has subject matter jurisdiction over the CFAA claim as it relates to Evans and Espinosa and thus pendent jurisdiction over the remaining state law claims.

B.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the court can enter a final decision on the merits of the case. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A party seeking entry of a preliminary injunction must establish (1) a

---

[14]While Curls' review of Clark's declaration indicates that nothing should have been permanently deleted, Curls did not examine Ryan's computers.

substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000) (citations omitted). A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.06(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

Here, Ryan contends that the claim brought under the CFAA and the state law claims for tortious interference with business relationships, violation of the FDUTPA, and breach of contract all support the entry of a preliminary injunction. As noted above, while not conceding jurisdiction, a violation of the CFAA, any tortious interference, or violation of the FDUTPA, Defendants do not seriously challenge the breach of contract claims or oppose entry

of a limited preliminary injunction pending further proceedings. Not all of the claims made by Ryan need be addressed at this time.

Defendants essentially concede the breach of contract claims against Evans and Espinosa, and on those claims Ryan is substantially likely to prevail. To establish a breach of contract, a plaintiff must prove that: "(1) a contract existed[;] (2) the contract was breached[;] and (3) damages flowed from that breach." *A.R. Holland, Inc. v. Wendco Corp.,* 884 So.2d 1006, 1008 (Fla. Dist. Ct. App. 2004).

As indicated above, the Employee Agreements (Doc. 14) contained provisions intended to ensure the confidentiality of Ryan's confidential and proprietary business information. To that end, the Employment Agreements provided that Evans and Espinosa "shall safely keep and preserve" all Confidential Information (as that term is defined in the Employee Agreements) and that they "will not, without the written consent of the Company [i.e., Ryan], disclose or make any use of such Confidential Information except as may be required in the course of rendering services under this Agreement." Evans and Espinosa also agreed "to immediately deliver to the Company all Confidential Information and all copies thereof upon termination of employment." The Employment Agreements also provided that Evans and Espinosa "agree[] at all times to adhere to the Company's policies and procedures, as the same may be updated and modified from time to time." Evans and Espinosa further covenanted in the Employee Agreements that they would not, directly or indirectly, "solicit, induce or attempt to induce any employee of the Company . . . to terminate employment . . . with the Company or . . . hire or engage as an employee or independent contractor any person who is or was employed by the Company during the term of [his] employment with the

16

Company."  They also stipulated that a breach of the Employee Agreements would cause irreparable harm to Ryan and would entitle Ryan to injunctive relief.  On the proffered evidence, Ryan is substantially likely to prevail on the claims that Evans and Espinosa breached the confidentiality covenants and that Evans also breached the anti-solicitation provision.

As for Merit, at present I find insufficient support for the claim that it violated the provisions of the CFAA.  On the available evidence, while Merit representatives availed themselves of the opportunity to review Ryan's confidential and proprietary information presented to them by Evans at the November 2010 meeting, and later, Merit IT personnel assisted Evans in uploading Ryan data and information onto Merit's server, it played no role in the purportedly illegal access by Evans or Espinosa in violation of the CFAA.

Similarly, on the available evidence, I cannot find that Ryan is substantially likely to prevail on the claim for tortious interference with business relationships.[15]  To prove a claim for tortious interference with a business relationship, a plaintiff must establish: (1) the existence of a business relationship between the plaintiff and a third party; (2) defendant's knowledge of the relationship; (3) defendant's intentional and unjustified interference with the relationship; and (4) damages to the plaintiff.  *Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126, 1127 (Fla. 1985).  By my consideration, the proffered evidence is insufficient to support the Defendant's intentional interference with an existing Ryan engagement and damage

---

[15]Ryan broadly claims that Defendants have solicited known customers of Ryan to steal their business through the use of unlawfully acquired information from Ryan.  (Doc. 2 at 14).

resulting therefrom.  While the evidence does support that Evans had direct contact with a few of Ryan's customers after joining Merit and he evidenced an intent to pursue new business with them on behalf of Merit, there is no adequate showing that he sought to, or did, interfere with any ongoing Ryan engagements.  Nor is there a showing of actual harm to Ryan as a consequence.  Again, neither Employee Agreement contained a covenant not to compete and, to the extent that the Defendants seek to compete fairly for new business, they may do so.[16] As for the Element Power proffer, based on the evidence presented, it seems doubtful that Ryan can establish that it had a business relationship with that company with which Defendants interfered.

However, on the available evidence I do find that Ryan may well prevail on its claim that Defendants violated the FDUTPA.  That Act makes it illegal to utilize "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204.  Civil remedies under the Act include damages and declaratory and injunctive relief.  Fla. Stat. § 501.211.  The aim of the FDUTPA is to protect the consuming public and legitimate businesses from those engaged in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or business.  *Suris v. Gilmore Liquidating, Inc.*, 651 So.2d 1282, 1283 (Fla. Dist. Ct. App. 1995).  A practice is unfair "if it offends established public policy, is

---

[16]A similar conclusion appears appropriate on Ryan's separate claim that Merit interfered with Ryan's *contractual* relationships with Evans and Espinosa.  The evidence proffered to this point does not suggest that Ryan is substantially likely to prevail on its allegation that Merit induced, assisted, and encouraged Evans and Espinosa to violate the terms of their Employee Agreements.

immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."

*Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145 (M.D. Fla.2007)

(citing *Suris*, 651 So.2d at 1283). "Although not specifically identified in the statute, there are

basically three elements that are required to be [proven] to establish a claim pursuant to

. . . FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."

*KC Leisure, Inc. v. Haber,* 972 So.2d 1069, 1073 (Fla. Dist. Ct. App. 2008) (citing *Bookworld*

*Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350 (M.D. Fla. 2007)).

      Here, the proffered evidence better supports Ryan's contention that Espinosa, and in

particular, Evans,[17] took considerable confidential or proprietary information from Ryan to

more quickly and easily facilitate the creation of a competing credits and incentives practice

with Merit in Tampa. By my consideration, the taking and use of such materials unfairly

diminishes any competitive advantage Ryan may have enjoyed because of its well-developed

systems and such constitutes an unfair method of competition within the contemplation of the

FDUTPA. Given that such matters were knowingly uploaded onto Merit's computers and

allowed to remain there, Merit cannot hide from responsibility on a claim of ignorance. As in

the case of the tortious interference claim, I find the evidence of damage to Ryan caused by the

Defendants acts is thin but not so thin as to deny relief on this motion.

---

[17]Even if Evan's and Espinosa's claims that they took this information so that they could assist Ryan in meeting upcoming deadlines for certain clients was true, it does not explain the variety of matters actually taken that suggest that they did not wish to start from scratch in creating all the necessary activities, systems, and forms and templates necessary to do credits and incentives work going forward.

On the matter of irreparable harm, as noted above, the Employee Agreements for Evans and Espinosa stipulated that a breach of the same would cause irreparable harm to Ryan and would entitle Ryan to injunctive relief. Beyond that, I conclude that Ryan has adequately demonstrated some harm to its goodwill as a result of the confusion that has been generated by Defendants' conduct. Such harm is not easily quantifiable in monetary damages and the loss of goodwill is an irreparable harm. *See Ferrero Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citing *Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir., Unit A, 1981)). The undue loss of competitive advantage caused by the taking of Ryan's data and information likewise is difficult to quantify monetarily and further supports the claim for irreparable harm in the absence of injunctive relief.

On the balancing of harms element, while I conclude that the injunction sought by Ryan goes beyond that to which it is entitled and would unduly limit Merit's ability to compete for new business, I conclude that a properly limited injunction will not impose undue burdens on any of the parties. *See Amedisys Holding, LLC v.Interim Healthcare of Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1314 (N.D. Ga. 2011).

Finally, the enforcement of valid contracts and fair competition in the marketplace both serve the public interest. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn*, 191 F. Supp. 2d 1346, 1354 (M.D. Fla. 2002) (injunctive relief not adverse to public interest where it merely prohibits defendants from using or disclosing plaintiff's confidential information or soliciting plaintiff's [current] customers and encouraging them to transfer their accounts and does not prohibit defendants from servicing plaintiff's former clients who choose to work with

20

defendants); *McLeod v. Ryan-McLeod, Inc.*, 206 So.2d 16, 17-18 (Fla. Dist. Ct. App. 1968) (injunctive relief not adverse to public policy where it does not restrain open competition).

III.

Accordingly, for the reasons set forth above, it is recommended that Ryan's **Emergency Motion for Temporary Restraining Order** (Doc. 2), construed as a motion for preliminary injunction, be **GRANTED in part** and that preliminary injunctive relief be granted on the following terms:

1. Defendants are enjoined from destroying or altering any evidence;

2. Defendants are enjoined to return to Ryan any and all information and data, in whatever format, taken from Ryan excluding matters of a purely personal nature to Evans and Espinosa. To facilitate the return of all such matters and to the extent that such has not already been agreed to, Defendants are ordered to permit the inspection of any computer and server storing Ryan's confidential or proprietary matters by a qualified independent forensic examiner under an agreed upon search protocol;

3. Defendants are enjoined from using or disclosing any Ryan confidential or proprietary information unless otherwise permitted by Ryan;

4. Defendants are enjoined from soliciting or providing services to any Ryan client in connection with any business for which Ryan had an engagement agreement with or with which (or whom) Ryan can demonstrate that it was negotiating an engagement agreement at the time Evans and Espinosa left its employ;[18]

---

[18]Given the lack of a non-compete restriction on Evans and Espinosa, I decline to recommend enjoining Defendants from soliciting *new* business, including new credits and incentives business, from any person or entity including those with past or present

5.  Defendants are enjoined from soliciting or inducing any Ryan employee from terminating his or her position with Ryan and hiring or engaging as an independent contractor any employee of Ryan who is or was employed by Ryan prior to Evan's and Espinosa's leaving its employ; and

6.  The provisions hereof shall take effect upon Ryan's posting a $25,000 bond.

Respectfully submitted on this
20th day of March 2012.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
Honorable James S. Moody, United States District Judge
Counsel of Record

---

engagements with Ryan.  On the matter of Evans' and Espinosa's work done on behalf of Element Power before and after leaving Ryan, such harm as may have been caused Ryan, if any, is readily quantifiable and amenable to an award of damages should such prove appropriate.  That work need not be enjoined at this time.